## Case No. 11,947.

### ROBINSON v. CATHCART.

[3 Cranch, C. C. 377.] [1]

Circuit Court, District of Columbia. Dec., 1828.[2]

PLEADING IN EQUITY—ANSWER—SPECIFIC EXECUTION—MISREPRESENTATION—VOLUNTARY CONVEYANCE—MISTAKE OF LAW—DECREE.

1. The answer of a defendant in chancery, is not evidence of new matter set up by way of defence, and not responsive to any allegation in the bill.

2. The representation by the plaintiff, of his opinion upon a subject respecting which the defendant is as competent to judge as the plaintiff, if honestly made, although incorrect, cannot be considered as such a misrepresentation of a material fact as should prevent a decree for the specific execution of a contract.

3. A voluntary settlement, however free from actual fraud, is, by the operation of the statute of 27 Eliz. c. 4, deemed fraudulent and void against a subsequent purchaser for a valuable consideration, even where the purchase has been made with notice of the prior voluntary settlement.

4. In the following words in a written contract, namely:—"In further confirmation of the said agreement, the parties bind themselves, each to the other, in the penal sum of $1,000," the sum of $1,000 is a penalty, and not liquidated damages.

5. The parol evidence, which is to control the plain legal import and construction of a written instrument, if admissible at all, (which, perhaps, it may be, in showing cause against a decree for specific performance,) should be very clear, strong, and explicit; and not dependent on mere inferences, drawn from equivocal expressions, recollected some years after the transactions.

6. The decree must be according to the allegata as well as the probata. If the defendant prove a matter not alleged, which would be a good defence, the court ought not to found its decree upon such matter, because the plaintiff is not bound to produce proof upon that point, and cannot be supposed to be prepared to answer it.

7. A mistake of the law is not a ground of relief in equity, where no fraud is charged.

Bill in equity [by William Robinson against J. L. Cathcart], for the specific execution of a contract. See a statement of the bill and answers in this cause, at May term, 1825, upon the motion to dissolve the injunction [Case No. 11,946]. In October, 1828, at an adjournment of May term, 1828, the cause came to final hearing, upon the bill, answers, general replication, and evidence, and was heard on the 30th and 31st of October and 1st of November.

C. C. Lee, for plaintiff. The defence consists of new facts, not responsive to the bill. The answer, therefore, is not evidence of those facts. There is no evidence of the misrepresentations relied upon in the answer.

As to the inadequacy of the price, he cited Prebble v. Boghurst, 1 Swanst. 329; Costigan v. Hastler, 2 Schoales & L. 166; Emery

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reversed in part in 5 Pet. (30 U. S.) 264.]

v. Wase, 8 Ves. 517; Coles v. Trecothick, 9 Ves. 246; Burrowes v. Lock, 10 Ves. 470.

The sum of $1,000 was a penalty, and not liquidated damages. Howard v. Hopkyns, 2 Atk. 371; Chilliner v. Chilliner, 2 Ves. Sr. 528; Hobson v. Trevor, 2 P. Wms. 191, 1 Strange, 533; Parks v. Wilson, 10 Mod. 515; Nels. 295; Anon., Mos. 37; Magrane v. Archbold, 1 Dow, 107; Prec. Ch. 102; Ponsonby v. Adams, 2 Brown, Parl. Cas. 431, 435; Lowe v. Peers, 4 Burrows, 2228; Astley v. Weldon, 2 Bos. & P. 346; Street v. Rigby, 6 Ves. 818; 1 Fonbl. 151; Woodward v. Gyles, 2 Vern. 119. The clear legal construction of a written sealed instrument cannot be controlled by parol evidence. The assignment of the Spanish fund to Mr. Woodside was voluntary, and void as to the plaintiff, who was a subsequent purchaser for a valuable consideration, without notice.

R. S. Coxe, for defendant. As to the misrepresentations of the plaintiff, equity will not enforce a specific execution unless the agreement be "fair, certain, and just" in all its parts. Buxton v. Lister, 3 Atk. 386; Clitherall v. Ogilvie, 1 Desaus. Eq. 257; O'Rourke v. Percival, 2 Ball & B. 62; Harnett v. Yeilding, 2 Schoales & L. 554. Nor in case of mistake. Mason v. Armitage, 13 Ves. 25; Clifford v. Brooke, Id. 135; Cadman v. Horner, 18 Ves. 10; Harnett v. Yeilding, 2 Schoales & L. 554; Hughes v. Edwards, 9 Wheat. [22 U. S.] 495. Parol evidence may be given to show mistake, or the intention. Wallace v. Baker, 1 Bin. 610; Dinkle v. Marshall, 3 Bin. 587; Reichart v. Castator, 5 Bin. 109; Drum v. Simpson, 6 Bin. 478; Hutchins v. Lee, 1 Atk. 447; Willis v. Willis, 2 Atk. 71; Young v. Peachy, Id. 254; Tayloe v. Sandiford, 7 Wheat. [20 U. S.] 17; 2 Evans, Poth. 86, App. No. 12.

As to the question whether the sum of $1,000 was a penalty or liquidated damages, he cited Chilliner v. Chilliner, 2 Ves. Sr. 528; 2 Evans, Poth. 7, 81, 93, 94; Gray v. Crosby, 18 Johns. 219.

Mr. Key, on the same side, cited Osgood v. Franklin, 2 Johns. Ch. 23; Mortlock v. Buller, 10 Ves. 292, 300; Day v. Newman, 2 Cox, Ch. 77; Sugd. 3, 4; Lee v. Thornton [Case No. 8,203], in this court, June, 1809; Hunt v. Rousmanier, 8 Wheat. [21 U. S.] 195, 211, 215.

Mr. Jones, in reply, as to inadequacy of price, cited 2 Bridg. Dig. 23, 25, 53, 56; Drewe v. Hanson, 6 Ves. 675; Rob. Frauds, preliminary chapter.

CRANCH, Chief Judge, after stating the substance of the bill, answers, and evidence, delivered the opinion of the court (THRUSTON, Circuit Judge, contra), as follows:

It will be perceived, by these answers, that Mr. Cathcart relies upon three grounds of defence: (1) Misrepresentation by the plaintiff during the negotiation. (2) The prior as-

signment of the Spanish claim, in trust for Mrs. Cathcart. (3) And an understanding expressed by Mr. Cathcart, at the time of executing the articles of agreement, and acquiesced in by the plaintiff, that he might refuse to comply with the contract on payment of the forfeiture, or penalty, of $1,000.

All the material allegations of the bill are admitted by the answers, and the defence consists of new matter set up by the defendant, in avoidance of the plaintiff's equity. The answers, therefore, so far as they are not responsive to the bill, are not evidence of such new matter. Hart v. Ten Eyck, 2 Johns. Ch. 88; Ringgold v. Ringgold, 1 Har. & G. 12; Skinner v. White, 17 Johns. 366, 367.

Let us, then, see what evidence there is of the facts upon which the defence is founded.

1. As to the misrepresentations. These are said to be: (1) As to the fitness of the place called Howard for an academy; (2) as to the boundaries of the land; (3) as to the value of the land.

(1) As to the fitness of Howard for an academy. The allegation in the answer is that the plaintiff "represented that it was well calculated for such an establishment as the defendant then had in contemplation." This representation, as stated in the answer, can only be understood to be a representation of an opinion, upon a subject respecting which the defendant was as competent as the plaintiff to judge. If such were honestly the plaintiff's opinion, and it should prove to be incorrect, it cannot be considered as such a misrepresentation of a material fact, as should prevent a decree for the specific execution of the contract. But there is no evidence of such a representation. Mr. Robinson, in his letter to Mr. Cathcart, of August 18, 1822, says: "It is certainly a very pleasant place, either for a man of fortune, or for one who would wish to establish an academy, either male or female." He does not say that it is well calculated for such an establishment as the defendant then had in contemplation. The opinion is only as to the pleasantness of the place for a man who wished to establish an academy. There is no other evidence of the plaintiff's representation upon that point; and there is no evidence that it was not a pleasant place for that purpose. This first item of misrepresentation may therefore be dismissed.

(2) The second is as to the boundaries of the land. The allegation of the answer is, "that the plaintiff represented to the defendant that the land which lies between the fence, near the brick house, on the place called Riddle's Place, and the house on the Howard Place, belonged to and was part of the Howard Place." "That the representations so made by the plaintiff, as aforesaid, have proved utterly fallacious and deceptive." "That a part of the land, which had been shown and represented to him as constituting part of the place, for the purchase of which he was negotiating, which was inclosed within the same fence, and which most essential-ly added to its value and comfort, did not belong to it." There is no evidence that the plaintiff made the representation here alleged. The only evidence which approaches to this point is the deposition of Miss Amelia H. Cathcart, who says she is "willing to declare on oath that William Robinson stated that Howard had on it a fine peach orchard, up by the fence, or near the fence, that divided Howard from Riddle's Place."

Without alluding to the circumstances under which this deposition was taken, and which were mentioned in the argument as going to its credit, it may be observed that Miss Cathcart only says she is "willing to declare on oath;" and she was only sworn to her willingness, according "to the best of her knowledge, belief, and recollection." She does not say when Mr. Robinson made that statement, nor that it was made to her father before the bargain was concluded. But her father knew better; for Mr. Robinson had informed him, by his letter to Mr. Cathcart of the 17th of August, 1822, that the orchard of fine fruit was on Riddle's Place; which, by the same letter, he offers to sell to Mr. Cathcart for $2,000, if he can get a title to it. And Mr. Cathcart, in his letter to Mr. Robinson of the 24th of August, 1822, when he offers $8,000 for Howard, in speaking of the forty acres called Riddle's Place, says: "And that, if I do not purchase it, that I shall not be put to any expense in the division and fencing off the said ——," meaning Howard or Riddle's Place; it is immaterial which. It shows that he knew that the fence was not on the line between the two places. And again, in his letter to Mr. R. on the 8th of February, 1823, he says that he is in no hurry for the deed, "but the plat would be of service, to indicate what part appertains to Howard;" which shows that he then knew that the fence was not on the line, and yet he did not complain of being deceived in that respect. In the same letter he also speaks of Mr. Robinson's intention to "fence in" Riddle's Place; and in no part of his correspondence with Mr. R. or Mr. Mason, before or after he had determined to resist the execution of the contract, did he complain of any misrepresentation, as to the boundaries. This second item of misrepresentation may, therefore, also be dismissed.

(3) The third is as to the value of the land. The allegation in the answer is, that the plaintiff informed the defendant, "that the Howard Place had cost him in money a very considerable sum more than $8,000; and he had held it at $10,000." "That the representations so made by the plaintiff, as aforesaid, have proved utterly fallacious and deceptive." "That the representations made as to the value of the farm are equally at variance with the truth." The representation alleged was certainly made by Mr. Robinson, in his letter of the 17th of August, 1822, but it is not a representation of its value, and there

is no evidence that it was false; on the contrary, it is substantially proved to be true by the depositions of Colonel Peyton and Mr. Wilbar.. But if it had been an untrue representation of its value, that is no ground for refusing to decree a specific execution of the agreement; for the value of real estate is very much a matter of opinion, and depends upon imagination and so many circumstances, that very few people would agree in fixing it. This third item of misrepresentation, therefore, may also be dismissed.

2. The second ground of defence is the prior assignment of the Spanish claim, in trust for Mrs. Cathcart. The allegation in the answer is, that, in negotiating with the plaintiff, Mr. Cathcart "communicated to him, frankly and fully, the situation in which he stood as to pecuniary resources, and that his ability to pay would be wholly dependent on the amount he should receive under the treaty." "To this claim, however, this defendant had long since relinquished his right, by a conveyance thereof to Mr. John Woodside, as trustee to Jane Banker Cathcart, wife of this defendant, dated the 10th of November, 1818." That Mr. Woodside, on the 15th of January, 1824, drew a draft "in favor of Richard Smith, cashier of the Branch Bank of the United States, for $8,550, payable out of the amount to be received under said Spanish treaty, on account of the claim aforesaid, to secure certain debts therein specified; which draft was given to and accepted by said Richard Smith, without any notice or intimation, as this defendant believes, of any prior lien; and therefore, as this defendant is advised, vested in the said Richard Smith a prior right, in law and equity, to said proceeds; the whole sum thus awarded béing only $6,900.27." With such an avowal of a double or treble imposition, we do not know whether this court, in the exercise of a sound discretion, ought to refuse its aid to the plaintiff, on account of the matters set up by this defendant as reasons why he should not be compelled to perform his contract. The suppression of the truth, at the time of the contract, was an act of mala fides which, perhaps, ought to induce the court to decree a specific performance, even if the assignment in favor of his wife were valid. He took upon himself the obligation to procure the assignment of that claim to be made to the plaintiff.

Whenever a defendant in equity asks to be relieved from his contract, he ought to show that the contract was made in good faith on his part, and not claim relief on the very ground of his own fraud. But the assignment in favor of Mrs. Cathcart was voluntary, and therefore not valid against the plaintiff, who was a subsequent purchaser, for a valuable consideration, without notice. Maddock (1 Madd. 271) says: "Whatever previous determinations there may formerly have been to the contrary, it is now fully settled upon the statute of 27 Eliz. c. 4, which was passed to prevent frauds on purchasers, that a voluntary settlement, however free from actual fraud, is, by the operation of that statute, deemed fraudulent and void against a subsequent purchaser for a valuable consideration, even where the purchase has been made with notice of the prior voluntary settlement. The statute receives the same construction, and produces the same effect, both in law and equity. And a purchaser of an equitable estate, for a valuable consideration, though with notice, is no more affected by a voluntary settlement than a purchaser of a legal estate. If therefore a man, after marriage, make the most prudent settlement on his wife and children, such as every wise man must approve; if the father is afterwards dishonest enough to sell, for a valuable consideration, the subject of the settlement, he may; and the sale cannot be impeached." "I hardly know an instance," says Lord Hardwicke, "where a voluntary conveyance has not been held fraudulent against a subsequent purchaser." White v. Sansom, 3 Atk. 412. And Sugden (Vend. 434, 439,) says: "A purchaser, without notice of a voluntary settlement, may compel a performance, in specie, of the agreement, although the settlement were made bona fide." "Any conveyance executed by a husband in favor of his wife or children after marriage, which rests wholly on the moral duty of a husband and parent to provide for his wife and issue, is voluntary, and void against purchasers, by force of the ·act." Sudg. Vend. 434. For this reason, as well as because a defendant cannot avail himself of his own fraud, this second ground of defence must fail.

3. The third ground of defence is a supposed understanding expressed by Mr. Cathcart at the time of executing the articles of agreement, and acquiesced in by the plaintiff, that the defendant might refuse to comply with the contract, on payment of the forfeiture or penalty of $1,000. Upon this point the allegation of the answer is: "That the sum of $1,000 was inserted by the defendant, in said article of agreement, with the full belief, on his part, that he might either take the property at the stipulated price, or pay the said sum, at his option; and that the agreement was executed by said complainant with full knowledge that such was the belief and understanding of this defendant." "That the said sum of $1,000, in the said articles of agreement mentioned, was inserted therein upon his, the defendant's, suggestion, and with the express understanding and intention that he might, at any time before the execution and delivery and acceptance of the several instruments by the parties respectively to be executed, give up said contract, on the payment of $1,000." "That if the complainant has any remedy against the defendant, it is for said penalty alone; and that subject to all legal and equitable offsets;

and that such remedy, if any exists, is to be had in a court of law;" and "can extend no further than the sum of $1,000, which was agreed upon and understood to be inserted therein, as the forfeiture which either party might incur by a non-compliance," and that "this amount must be subject to all legal and equitable deductions."

The first question, arising upon this allegation, is whether it be sufficiently proved. The only evidence in support of it is that which is derived from the depositions of Mr. Cathcart's family. Some doubt is thrown upon the credit of those depositions by the circumstances and manner in which they were taken. They appear to have been drawn up in the family, ex parte, and upon leading interrogatories; and in this form to have been brought to the magistrate; before whom the deponents made oath that their answers were true, "to the best of their knowledge, belief, and recollection." Some of them, particularly Mr. Hutton's, which is the most important of them, had been before sworn to, as a voluntary affidavit. Under these circumstances the counsel for the plaintiff declined a cross-examination, as deeming them not worthy of credit.

One of these deponents, Mr. Hutton, the son-in-law of Mr. Cathcart, and residing in his house, testified, on the 12th of May, 1827, "to the best of his recollection, knowledge, and belief," that he was certainly quite ready to "swear or affirm" to the truth of the declaration he had before made on the 16th and sworn to on the 17th of July, 1824, before Mr. Moulder, which was since the filing of this bill. In this declaration he states that on or about the 10th of September. 1822, he was present at the house of Mr. Cathcart, in Washington, when the terms of the purchase of the farm called Howard were discussed by Mr. Cathcart and Mr. Robinson, and finally settled and concluded. That Mr. Robinson, having made a loose draft of the terms in writing, "the said Cathcart thereupon proceeded to draw up, in a more formal manner, articles of agreement; and having proceeded to some length therein, was interrupted by a remark that was made by one of the parties, (I do not distinctly recollect which,) relating to the propriety of providing for a pecuniary forfeiture, in the event of the non-performance of the stipulations of the agreement, by either of the parties, the said Cathcart referred to the said Robinson to say how much the penalty should be; to which the said Robinson replied, 'he did not care how much; it made no difference to him,' or words to that meaning, and added $20,000. To this the said Cathcart decidedly and promptly objected, and refused to accede. declaring it to be decidedly too much; and assigned, as the reasons of his objections, that he had passed a large part of his life in the public service; was then endeavoring to, and had expectations of being again employed, in which case

it might become more to his advantage to give up the place. That the expected employments might be such as indeed to justify and enable him to pay a smaller penalty, if he found it necessary or expedient to violate the agreement, though they should not be such as to enable him to pay a larger one. He then stipulated one thousand dollars as the amount of the penalty, to which the said Robinson acceded, under (as it clearly appeared to me,) a full understanding of the privilege of relinquishment reserved by the said Cathcart, on the payment of the penalty of 1.000 dollars as aforesaid; which said sum of 1.000 dollars was inserted as the amount of the penalty in the articles of agreement which were then and there as before declared, made out in duplicates, and signed by the said Cathcart and Robinson."

If the whole of Mr. Hutton's declaration should be admitted to be true, does it prove any thing more than that Mr. Cathcart objected to subject himself to the payment of damages, for the breach of the contract, to a greater amount than 1,000 dollars? It would probably be so understood by every man of business; and it is natural to suppose that Mr. Robinson so understood it. The written contract is clear and unequivocal. Instead of saying that either party should be permitted to rescind the contract upon payment of 1,000 dollars, or that 1,000 dollars should be the liquidated damages, upon payment of which either party might retract the bargain; it says, expressly, that "in further confirmation of the said agreement, the parties bind themselves, each to the other, in the penal sum of 1,000 dollars." Nothing can be more certain than that, upon the face of this written instrument, the sum of 1,000 dollars is a penalty, and not liquidated damages. The parol evidence which is to control the plain legal import and construction of a written instrument. if admissible at all (which perhaps it may be, in showing cause against a decree for specific performance, 1 Madd. 405, 406, 408), should be very clear, strong, and explicit; and not dependent on mere inferences drawn from equivocal expressions recollected some years after the transaction. If Mr. Robinson did not clearly understand Mr. Cathcart as claiming a right to rescind the bargain upon payment of the penalty, there was no agreement to that effect. The allegation in the answer, as we understand it, is, that such was the understanding and agreement of the parties.

The decree of this court must be according to the allegata, as well as the probata; and if a sufficient defence could be made out in proof, yet if it be not in the allegations it will not avail the defendant. Nothing is put in issue which is not alleged in the bill or answer; and neither party is bound to produce evidence in relation to matters not in issue. If the defendant prove a matter not alleged, which would be a good defence, the court ought not to found its decree on such

matter; because the plaintiff is not bound to produce proof upon that point, and cannot be supposed to be prepared to answer it. Coop. Eq. 328, 329, 333–335, 339, 340; 2 Madd. Ch. 368, 373–375, 378; Jones v. Jones, 3 Atk. 111; Goodwin v. Goodwin, Id. 370. The same observation may apply to the inadequacy of price, which was much argued at the bar. Upon this point, however, we will cite the words of the court of appeals of Virginia, in the case of Ward v. Webber, 1 Wash. [Va.] 274. "A court of equity will never decree iniquity; and there are instances where they have refused to decree hard bargains, though fair; but these are rare, and are generally cases of glaring hardship; for, in general, the court will not undertake to estimate the speculations of parties in a contract, but will deem them the best judges of their own views, and will compel a performance, though they may be eventually disappointed in their expectations." See, also, Adams v. Weare, 1 Brown, Ch. 569; 1 Madd. 408.

To return, however, to the declaration of Mr. Hutton, he says, that when Mr. Robinson was asked what should be the amount of the penalty, he said, "he did not care how much; it made no difference to him." Can it be supposed that Mr. Robinson, who has been represented as a shrewd man, and careful of his interest, should be perfectly indifferent as to the amount of the sum, upon the payment of which either party might rescind the contract? especially as, according to the representation of the defendant, he had made a good bargain, and got more for his property than it was worth? Was it indifferent to him whether the defendant assigned to him the Spanish claim? whether he insured the house? or whether he paid the purchase-money after having had possession of the property? And yet he must have been so if it were indifferent to him what even Mr. Cathcart should pay for liberty to rescind the bargain. It is clear, then, that Mr. Robinson did not understand Mr. Cathcart as insisting upon the right to rescind the bargain on payment of the $1,000; or that if he did so understand him, he never assented to, or acquiesced in that understanding, so as to form an agreement. If that had been the understanding of either party, he would have limited a time for repentance, a locus penitentiæ. How long was the right to rescind to continue? Mr. Cathcart says, till the execution, delivery, and acceptance of the several instruments which were to be executed. But Mr. Hutton says nothing of this. According to his account of the transaction, no time was limited. The natural inference would be that the parties took time to consider; and that, during that time, things were to remain unchanged; and if either party did any act affirming the bargain, he thereby made his election, and waived his right to rescind. But we think there is no evidence of any such agreement.

The bargain was effectually made before the articles were written, on the 10th of September. Mr. Cathcart, in his letter of the 24th of August, 1822, offered the terms, which were accepted by Mr. Robinson; and in that letter he does not reserve any locus penitentiæ; nor say any thing of stipulated damages; or of a sum to be forfeited. And, in his letter of the 4th of September, 1822, he tells Mr. Robinson, that if he agrees to the terms offered, he may consider the business settled. Mr. Robinson did agree to the terms; and on the 9th of September, gave Mr. Cathcart a letter to Mr. Wilbar, authorizing him to deliver the possession. In the original agreement there was no reservation of a right to rescind. According to Mr. Hutton, the idea of a penalty was first started after the bargain had been made, and the articles of agreement were almost finished. It was a sudden thought; and a matter which Mr. Robinson deemed wholly unimportant. From the 10th of September to the 8th of February, Mr. Cathcart was anxious to execute the instruments, and called two or three times on Mr. Jones, who was to prepare them. On the 1st of October, 1822, he took possession of the property; and during all this time not a word was said between the parties respecting the right to rescind.

Upon the whole, it seems clear to us, that no right to rescind was reserved by either party. If the answer can be supposed to insist on the simple mistake of the legal import of the written agreement, it was a mistake of the law; but this is not a ground of relief in equity where no fraud is charged. Lord Irnham v. Child, 1 Brown, Ch. 92, and Howard v. Hopkyns, 2 Atk. 371. In this last-mentioned case of Howard v. Hopkyns, there was a proviso in the agreement, "that if either side should break the agreement, he should pay £100 to the other." The defendant contended that it was the intention of the plaintiff and defendant, that, upon either paying the £100, the agreement should be absolutely void. But the lord chancellor said, "as to the defence of the stipulated sum, I cannot take this to let off either party when they please; but it is no more than the common case of a penalty; for it might be inserted by the plaintiff in order to be paid for his trouble in viewing and measuring the estate, taking plans, &c., supposing the defendant should not be able to make out a title." "In all cases where penalties are inserted in case of non-performance, this has never been held to release parties from their agreement, but they must perform it notwithstanding." See, also, Hopson v. Trevor, 1 Strange, 533, 2 P. Wms. 191; Parks v. Wilson, 10 Mod. 515; Lennon v. Napper, 2 Schoales & L. 684; Magrane v. Archbold, 1 Dow, 107; Telfair v. Telfair, 2 Desaus. Eq. 271; Sugd. Vend. (2d Am. Ed., Phila., 1820) 163. Fonblanque (volume 1, p. 108) says: "As to ignorance of law, it may be laid down as a general proposition, that it shall not affect

agreements, nor excuse from the consequences of particular acts, even in courts of equity." Eden on Injunctions (page 10) says: "There are numerous cases in which the court has refused to interfere where an instrument has been executed, or a sum of money paid, under an erroneous notion of the law." Mildmay v. Hungerford, 2 Vern. 243; Harman v. Cam, 4 Vin. Abr. 387: Wildey v. Coopers' Co., 3 P. Wms. 127, note; Atwood v. Lamprey, Id.; Lord Irnham v. Child, 1 Brown, Ch. 92; Langstaffe v. Fenwick, 10 Ves. 406; Currie v. Goold, 2 Madd. 163. "We may now, therefore, consider the maxim, 'Ignorantia juris non excusat,' as fully recognized in equity, as it has been unquestionably established in civil cases at law. Dig. 22, tit. 6; Cod. 1, 18; 'De juris et facti ignorantiâ;' Code Nap. 2052, 3, 8." See, also, Powell's opinion in Gwinne v. Poole, Lutw. 1569. If, therefore, the question of mistake of the legal import of the written agreement be in issue, it cannot avail the defendant if proved. But we do not think it is proved. If there were any mistake, it seems only as to the jurisdiction of a court of equity to enforce a specific performance of a contract, notwithstanding the insertion of a penalty. Both parties and the witness, Mr. Hutton, at the time of the execution of the written agreement, understood it to be a penalty; and the defendant in his answer, is cautious not to admit that he is liable for the whole amount, but avers that it is subject to all legal and equitable off-sets and deductions; which we understand to amount to an admission that it was a mere penalty to cover damages at law. Such a mistake, or ignorance of the extent of the jurisdiction of a court of equity, is an instance of that ignorantia juris which Fonblanque says is no excuse, even in courts of equity. Liquidated damages must be in lieu of the contract (Gray v. Crosby, 18 Johns. 219); but this penalty is expressly declared, in the written contract, to be "in further confirmation of the agreement." That this is a penalty, according to the legal construction of the writing, is too plain to need the support of the numerous authorities which have been cited. The smallness of the penalty has been urged as an argument in support of the idea that it was intended as liquidated damages, and not a mere penalty. But to our minds it affords evidence of the contrary proposition. It was inadequate indemnity to either party for the non-performance of the contract. For if Mr. Cathcart, who had obtained possession, had been successful in establishing his academy to the extent of his expectations, and had made great improvements, which might have been the case; before all the instruments should have been executed, he would probably have thought the sum of $1,000 very inadequate compensation to him for his losses, if Mr. Robinson should have rescinded the bargain, and broken up the establishment, or if Mr. Cathcart should have been evicted by one having a better title. On the other hand, Mr. Robinson would have found that sum wholly insufficient to remunerate him for his loss, if Mr. Cathcart should have failed to insure the buildings, (which constituted a very large part of the value of the property,) and they should have been consumed by fire. It is most natural, therefore, to suppose that the penalty was inserted to limit the responsibility of the parties for damages at law: leaving to each his remedy in equity to enforce the specific performance of the contract. We think, therefore, that no argument can be drawn in favor of the defendant, from the smallness of the penalty. If the questions of inadequacy of price, and healthiness of the place, are put in issue, they are not supported by the evidence. The questions respecting the meadow, the springs, the rent due by Wilbar, and his agreement to do certain things upon the land, are certainly not in issue, and are wholly immaterial.

Upon the whole, we are of opinion that the defendant has not made out such a defence as will justify this court in refusing to decree a specific performance of the contract.

The decree in substance was, that the Spanish fund should be paid over to the plaintiff, in part payment of the purchase-money and interest from January, 1825; that the defendant should pay the balance by the 1st October, 1829, upon payment of which he should be entitled to the deed filed in the cause, and which had been offered to him in June, 1823, and in default of payment of the balance, that the place, called Howard, should be sold to raise the money.

This decree was reversed in part. upon appeal to the supreme court. See 5 Pet. [30 U. S.] 264.